**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| DIGITAL SATELLITE CONNECTIONS, | : | |
| LLC, and KATHY KING, | : | |
| | : | Case No. 5:13-CV-00047-ACC-PRL |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DISH NETWORK CORPORATION, | : | |
| DISH NETWORK, LLC, and DISHNET | : | |
| SATELLITE BROADBAND, LLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS OF**
**DEFENDANTS, DISH NETWORK CORPORATION, DISH NETWORK L.L.C.,**
**AND DISHNET SATELLITE BROADBAND L.L.C.**

Defendants, DISH Network Corporation, DISH Network L.L.C., and dishNET

Satellite Broadband L.L.C. (collectively, "Dish Network"), by and through their

attorneys, answer the Complaint of Plaintiffs, Digital Satellite Connections, LLC

("DSC") and Kathy King ("Ms. King") (collectively, "DSC"), as follows.  For reference,

the original paragraphs in the Complaint are reproduced here, followed by Dish

Network's response.  The paragraph numbers correspond to those in the Complaint.

Dish Network expressly denies the allegations set forth in the introductory

unnumbered paragraphs to the Complaint.

## PARTIES

1.      Dishnet is a Florida limited liability company whose principal place of

business is located in Dunnellon, Florida.

**RESPONSE**:  Dish Network is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 1 and therefore denies them.

2.      Kathy King ("King") is an individual residing in Dunnellon, Florida.

**RESPONSE**:  Dish Network is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2 and therefore denies them.

3.      Upon information and belief, Dish Network Corporation is a Colorado corporation, with its principal place of business in Englewood, CO.

**RESPONSE**:  Dish Network admits that DISH Network Corporation's principal place of business is located in Englewood, Colorado; DISH Network Corporation is a Nevada Corporation, not a Colorado corporation.

4.      Upon information and belief, Dish Network is a Colorado corporation, with its principal place of business located in Englewood, CO.

**RESPONSE**:  Dish Network admits only that DISH Network L.L.C.'s principal place of business is located in Englewood, Colorado; DISH Network L.L.C. is a Colorado limited liability company.

## JURISDICTION AND VENUE

5.      This court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121(a), 28 U.S.C. §§ 1331, 1332, and 1338(a).

**RESPONSE**:  Admitted.


6.      This court has personal jurisdiction over the Defendants due to their acts of direct and/or contributory trademark infringement and other unlawful acts which have caused injury in this district to Dishnet and its DISHNET trademark and to King.

**RESPONSE**:  Denied.

7.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2).

**RESPONSE**:  Denied.

## FACTUAL ALLEGATIONS

8.     Dishnet has sold and/or sells to the public entertainment programming, internet and cellular services from various sources including Dish Network, DirectTV, EarthLink and other communications / programming wholesalers.

**RESPONSE**:  Dish Network admits only that DSC previously sold various Dish Network products and services.  Dish Network is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 8 and therefore denies them.

9.     Dishnet is the owner of all rights, title and interest in and to the mark DISHNET, which has been registered in the state of Florida as follows:

| Registration No. | Class | Services |
| --- | --- | --- |
| L12000162008 Internet | Service Mark | Communication services, access services and Sales of television communications programming |

**RESPONSE**:  Denied.

10.     Dishnet owns and operates the dishnet.com website where it uses the DISHNET mark in connection with communication services, internet access services and sales of television communications programming.

**RESPONSE**:  Dish Network is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 10 and therefore denies them.

11.     Representative content from Dishnet's website at dishnet.com is:



**RESPONSE**:  Dish Network is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 11 and therefore denies them.

12.     Dishnet is the owner and user of the mark DISHNET, having been assigned all right title and interest in such mark, and all goodwill associated therewith, and the dishnet.com domain name, by its predecessor in interest.

**RESPONSE**:  Denied.

13.     The DISHNET mark has been in continuous use in interstate commerce by Dishnet and/or its predecessor in interest since June 1, 1999 or earlier.

**RESPONSE**:  Dish Network is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 13 and therefore denies them.

14.     As a result of the continuous use of the DISHNET mark referred to above, the DISHNET Mark has been identified associated with Dishnet with respect to communication services, internet access services and sales of television communications programming.

**RESPONSE**:  Denied.

15.     The DISHNET mark is well-known and famous throughout the United States and associated by the public with Dishnet.

**RESPONSE**:  Denied.

16.     Dish Network Corporation, Dish Network and Dishnet Satellite Broadband have known about Dishnet and/or its predecessor in interest and their use of the DISHNET mark dating back to at least 1999.

**RESPONSE**:  Denied.

17.     Dishnet began selling DishTV programming in the 1990s.  Dishnet has also been one of the largest installers of satellite dishes in the Southeast.

**RESPONSE**:  Dish Networks admits only that DSC previously sold Dish Network television products and services in the late 1990s.  Dish Network is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 17 and therefore denies them.

18.     Dishnet has offered entertainment programming, internet and cellular services from various sources including Dish Network, DirectTV, EarthLink and other communications / programming wholesalers.

**RESPONSE**:  Dish Network admits only that DSC previously sold Dish Network products and services.  Dish Network is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 18 and therefore denies them.

19.     Upon information and belief, Dishnet has been Dish Network's third largest retailer in the country.

**RESPONSE**:  Denied.

20.     Dishnet estimates that Dish Network has generated over $9,000,000 per year in revenues from Dishnet's customers.

**RESPONSE**:  Dish Network is without knowledge or information sufficient to form a belief as to DSC's estimates, but denies that Dish Network has generated over $9,000,000 per year in revenues from DSC's customers.

21.     Dishnet has not licensed or authorized any of the Defendants to directly use or contributorily permit the use of the DISHNET mark.

**RESPONSE**:  Denied.

22.     Defendants have no consent, license or approval or other authorization from Dishnet to use, directly or indirectly, or by action in concert with any direct trademark infringer, the DISHNET mark in association with communication services, internet access services and sales of television communications programming.

**RESPONSE**:  Denied.

23.     Defendants have adopted and used the DISHNET mark with the willful intent to cause confusion and mistake and to deceive consumers as to the affiliation, connection or association of Dish Network Corporation, Dish Network and Dishnet Satellite Broadband to the DISHNET Mark and to Dishnet.

**RESPONSE**:  Denied.

24.     Defendants know or had reason to know that they were infringing upon Dishnet's trademark and causing damage to Dishnet.

**RESPONSE**:  Denied.

25.     Defendants began filing a large number of new trademark applications in 2012, including two intent-to-use applications for the mark DISHNET for Internet services.  Those applications were signed by Max Gratton and include the statement that "no other person, firm, corporation, or association has the right to use the mark in commerce . . . ."

**RESPONSE**:  Dish Network admits that, in 2012, DISH Network L.L.C. filed, *inter alia*, a federal trademark application for the mark, DISHNET, for certain communications equipment, software, and hardware, and a federal trademark application for the mark, DISHNET, for certain Internet services and related services, and that both trademark applications speak for themselves.

26.     Upon information and belief, Defendants are, together and/or separately, extremely sophisticated and experienced consumers of intellectual-property matters, having had ownership of more than 1,100 domain names.

**RESPONSE**:  The paragraph as currently alleged is unintelligible and therefore is denied.

27.     Upon information and belief, Defendants together and/or separately, currently own approximately 600 domain names.

**RESPONSE**:  Denied.

28.     Upon information and belief, Defendants together and/or separately, recently applied to register 13 Top Level Domain Names.  Each application had a $185,000 filing fee for a total of $2,405,000.

**RESPONSE**:  Denied.

29.     Upon information and belief, Defendants together and/or separately, have recently spent millions of dollars purchasing domain names from others, trademarks from others, in addition to applying for new trademark applications and top level domains.

**RESPONSE**:  To the extent this allegation can be understood, it is denied.

30.     On September 26, 2012, Defendants together and/or separately issued a press release to announce their new "DISHNET" offering.  In this press release, one or all falsely implied they owned the dishnet.com domain name, stating, "Satellite broadband service includes five @dishNET.com email accounts, each with 2 GB of storage . . . ."

**RESPONSE**:  Dish Network admits that, in September 2012, DISH Network Corporation issued a press release announcing the launch of its satellite broadband Internet service called "dishNET" and that the press release speaks for itself; otherwise denied.

### COUNT I: DEMAND FOR PRELIMINARY AND PERMANENT INJUNCTION PURSUANT TO 15 U.S.C. §§ 1116, 1117, 1118 AND 1125

31.     Dishnet incorporates all previous paragraphs of this Complaint.

**RESPONSE**:  Dish Network incorporates herein its responses to paragraphs 1-30.

32.     Dishnet has a reasonable likelihood of succeeding on the merits of the claims asserted herein against Defendants.

**RESPONSE**:  Denied.

33.     Without the immediate entry of a preliminary and permanent injunction prohibiting the continued wrongful acts of Defendants, Dishnet will suffer irreparable harm and will have no adequate remedy at law.

**RESPONSE**:  Denied.

34.    In addition, the unlawful conduct of Defendants has caused and will continue to cause Dishnet damages in an amount that Dishnet will prove, and such damages shall continue to accrue unless and until their unlawful conduct is immediately enjoined and prohibited.

**RESPONSE**:  Denied.

## COUNT II: TRADEMARK INFRINGEMENT PURSUANT TO 15 U.S.C. § 1125

35.    Dishnet incorporates all previous paragraphs of this Complaint.

**RESPONSE**:  Dish Network incorporates herein its responses to paragraphs 1-34.

36.    Defendants' unlawful actions constitute an unlawful use in commerce, without the consent of Dishnet, of a reproduction, counterfeit, copy or colorable imitation of Dishnet's DISHNET mark which is likely to cause confusion and mistake and to deceive, all in willful violation of 15 U.S.C. §1125.

**RESPONSE**:  Denied.

37.    Defendants' unlawful actions have caused and continue to cause Dishnet irreparable harm for which there is no adequate remedy at law.  Such irreparable harm will continue until and unless their unlawful activities are preliminarily and permanently enjoined.

**RESPONSE**:  Denied.

38.    In addition, the unlawful conduct of Defendants has caused and will continue to cause Dishnet damages in an amount that Dishnet will prove, and such damages shall continue to accrue unless and until their unlawful conduct is immediately enjoined and prohibited.

**RESPONSE**:  Denied.

## COUNT III: FALSE DESIGNATION OF ORIGIN, FALSE
## DESCRIPTIONS AND UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

39.     Dishnet incorporates all previous paragraphs of this Complaint.

**RESPONSE**:  Dish Network incorporates herein its responses to paragraphs 1-38.

40.     Defendants' unlawful actions have caused and will continue to cause confusion and mistake and to deceive as to the affiliation, connection, or association of Defendants with Dishnet and its trademark and domain name, as to the origin, sponsorship, or approval of Defendants' services and commercial activities, all in willful violation of 15 U.S.C. § 1125(a) until and unless their unlawful actions are preliminarily and permanently enjoined immediately.

**RESPONSE**:  Denied.

41.     Defendants' unlawful actions have caused and continue to cause Dishnet irreparable harm for which there is no adequate remedy at law.  Such irreparable harm will continue until and unless their unlawful activities are preliminarily and permanently enjoined.

**RESPONSE**:  Denied.

42.     In addition, the unlawful conduct of Defendants has caused and will continue to cause Dishnet damages in an amount that Dishnet will prove and such damages shall continue to accrue unless and until their unlawful conduct is immediately enjoined and prohibited.

**RESPONSE**:  Denied.

## COUNT IV: TRADEMARK INFRINGEMENT
## UNDER FLORIDA STATUTORY LAW

43.     Dishnet incorporates all previous paragraphs of this Complaint.

**RESPONSE**:  Dish Network incorporates herein its responses to paragraphs 1-42.

44.     Defendants' unlawful actions have caused and will continue to cause confusion and mistake and to deceive as to the affiliation, connection, or association of Defendants with Dishnet and its trademark, as to the origin, sponsorship, or approval of Defendants' services and commercial activities, all in willful violation of Florida statutory law until and unless their unlawful actions are preliminarily and permanently enjoined immediately.

**RESPONSE**:  Denied.

45.     Dishnet has registered its DISHNET Mark with the State of Flordia[sic].

**RESPONSE**:  Dish Network is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 45 and therefore denies them.

46.     Defendants' actions constitute infringement if [*sic*] Dishnet's Florida Trademark Registration under Florida Statute Title XXXIII Chapter 495.131.

**RESPONSE**:  Denied.

47.     The unlawful conduct of Defendants has caused and will continue to cause Dishnet damages in an amount that Dishnet will prove, and such damages shall continue to accrue unless and until their unlawful conduct is immediately enjoined and prohibited.

**RESPONSE**:  Denied.

## COUNT V: TRADEMARK INFRINGEMENT
## UNDER FLORIDA COMMON LAW

48.     Dishnet incorporates all previous paragraphs of this Complaint.

**RESPONSE**:  Dish Network incorporates herein its responses to paragraphs 1-47.

49.     Defendants' unlawful actions are likely to cause confusion, and to cause mistake and to deceive as to the affiliation, connection, or association of Defendants with Dishnet as to the origin, sponsorship, or approval of Defendants' services and commercial activities, thereby willfully infringing Dishnet's common law rights in and to the DISHNET mark.

**RESPONSE**:  Denied.

50.     Defendants' unlawful actions have caused and continue to cause Dishnet irreparable harm for which there is no adequate remedy at law.  Such irreparable harm will continue until and unless their unlawful activities are preliminarily and permanently enjoined.

**RESPONSE**:  Denied.

51.     The unlawful conduct of Defendants has caused and will continue to cause Dishnet damages in an amount that Dishnet will prove, and such damages shall continue to accrued unless and until their unlawful conduct is immediately enjoined and prohibited.

**RESPONSE**:  Denied.


### COUNT VI: CONTRIBUTORY TRADEMARK INFRINGEMENT

52.     Dishnet incorporates all previous paragraphs of this Complaint.

**RESPONSE**:  Dish Network incorporates herein its responses to paragraphs 1-51.

53.     Dish Network Corporation, Dish Network and Dishnet Satellite Broadband know or had reason to know that each was infringing Dishnet's trademark for the purpose of realizing profit.

**RESPONSE**:  Denied.

54.     Dish Network Corporation, Dish Network and Dishnet Satellite Broadband have willfully contributed to the infringement of the DISHNET trademark by causing others, such a[sic] Defendants' reseller and retailers, to display or otherwise use the DISHNET mark without Dishnet's permission and thereby infringe the mark for the purpose of realizing profit.

**RESPONSE**:  Denied.

55.     Defendants' unlawful actions have caused and continue to cause Dishnet irreparable harm for which there is no adequate remedy at law.  Such irreparable harm will continue until and unless their unlawful activities are preliminarily and permanently enjoined.

**RESPONSE**:  Denied.

56.     The unlawful conduct of Defendants has caused and will continue to cause Dishnet damages in an amount that Dishnet will prove, and such damages shall continue to accrue unless and until their unlawful conduct is immediately enjoined and prohibited.

**RESPONSE**:  Denied.

### COUNT VIII: BREACH OF CONTRACT

57.     Dishnet incorporates all previous paragraphs of this Complaint.

**RESPONSE**:  Dish Network incorporates herein its responses to paragraphs 1-56.

58.     King has had an agreement with Dish Network whereby Dish Network agreed to pay King amounts resulting from King's referring some of its customers to Dish Network.

**RESPONSE**:  Dish Network admits only that it had prior retailer agreements with DSC, but denies that Dish Network has failed to comply with any of its obligations under such agreements.

59.     Dish Network has failed to pay King amounts owing pursuant to the agreement.

**RESPONSE**:  Denied.

60.     King has been damaged by Dish Network's failure.

**RESPONSE**:  Denied.

61.     Dish Network's failure to pay King constitutes breach of contract.

**RESPONSE**:  Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense:  Failure to State a Claim

62.     The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense:  All Claims Barred by Contract

63.     DSC and King's claims are barred by the terms of one or more agreements entered into by and between Ms. King and/or DSC, on the one hand, and Dish Network, and/or its predecessor-in-interest, on the other hand.

### Third Affirmative Defense: Waiver

64.     DSC and King have expressly waived their claims raised in this action.

### Fourth Affirmative Defense:  Abandonment

65.     DSC and King's claims should be dismissed because DSC and King have abandoned any rights they may have in their alleged trademark.

### Fifth Affirmative Defense: Prior Rights

66.     DSC and King's claims are barred in part because Dish Network has prior rights in the alleged trademark.

**Sixth Affirmative Defense:  Equitable Doctrines**

67.     DSC and King's claims are barred by the equitable doctrines of laches, estoppel, acquiescence, and/or unclean hands.

## COUNTERCLAIMS

DISH Network L.L.C., and dishNET Satellite Broadband L.L.C. (collectively "Dish Network"), by and through its attorneys, assert the following Counterclaims against DSC and Kathy King (collectively "DSC"), and allege as follows:

1.     This is an action for breach of contract; infringement of a federally registered trademark under the Lanham Act; trademark infringement, false designation of origin, and unfair competition under the Lanham Act; false advertising under the Lanham Act; trademark infringement and unfair competition under common law; violation of the Colorado Consumer Protection Act; violation of the Florida Deceptive and Unfair Trade Practices Act, cybersquatting under the Lanham Act; federal dilution under the federal Trademark Dilution Revision Act and fraud and cancellation under Florida law.  Dish Network seeks injunctive relief, as well as damages, profits, treble damages, statutory damages, attorneys' fees, and costs.

## THE PARTIES

2.     DISH Network L.L.C. is a Colorado limited liability company with a principal place of business at 9601 South Meridian Boulevard, Englewood, Colorado 80112.

3.     dishNET Satellite Broadband L.L.C. is a Colorado limited liability company with a principal place of business at 9601 South Meridian Boulevard, Englewood, Colorado 80112.

4.     Upon information and belief, Ms. King is an individual residing in Dunnellon, Florida.

5.     Upon information and belief, DSC is a Florida limited liability company with a principal place of business at 20359 East Pennsylvania Avenue, Suite I, Dunnellon, Florida 34432.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, and 1367.

7.     This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367 and under the principles of pendent jurisdiction.

8.     This Court has personal jurisdiction over DSC in this action by virtue of their acts, which have taken place in the State of Florida, which constitute breach of contract, and which are designed to cause and are causing substantial confusion and deception among consumers in Florida and irreparable injury to Dish Network's invaluable reputation and goodwill.  Upon information and belief, DSC's principal place of business is located in the State of Florida, and Ms. King is a resident of the State of Florida.

## FACTS

Dish Network's Exclusive Rights in the DISH NETWORKS Marks

9.     Since at least as early as March 1996, Dish Network has extensively and exclusively advertised, promoted, and marketed its products and services under the trademarks DISH (including the stylized "dish" logo) and DISH NETWORK (collectively, the DISH NETWORK Marks).

10.     Dish Network has spent millions of dollars in advertising, and promoting its products and services under the DISH NETWORK Marks through a variety of advertising and promotional channels, including in print, radio, television, and online media.  As a result of Dish Network's extensive advertising and robust sales, the DISH

NETWORK Marks have become famous and widely recognized by the general consuming public of the United States.

11.     Dish Network owns numerous registrations on the Principal Register of the United States Patent and Trademark Office for its DISH family of mark, including the following:

| Mark | App. No. | Reg. No. | Goods/Services | Mark Image |
|------|----------|----------|----------------|------------|
| DISH NETWORK | 78/588,830 | 3,264,300 | communications equipment; namely, signal frequency receivers, antennae for receiving signal frequencies and component parts sold together as a unit; communications software, namely, system application and operating software for residential and commercial satellite receiver systems; communications software, namely, networking software for residential and commercial audio, video and telephony systems; satellite receivers, routers, hubs, fiber optic cabling, all for residential and commercial satellite receiver systems; televisions; satellite receivers, antennae, low noise converters, feed horns, amplifiers, actuators, modulators, coaxial-custom cables, decoders and electronic encryption equipment unit all for residential and commercial satellite receiver systems; optional-peripheral modules for residential and commercial satellite receivers, personal computer receiver cards; telephone extension circuitry; micro-processor based plastic cards which interface with and comprise the residential and commercial satellite receiver security system, software reflecting the on-screen listing of available programming, universal remote controls for home electronic devises, namely televisions, VCRs, DVD players, stereo receivers, and stereo | N/A (standard character mark) |

| | | | amplifiers, and component parts sold together as a unit for the aforementioned goods, operator maintenance and instructional manuals distributed therewith; telecommunication services, namely, transmission of video, image, voice, audio, data information via television, satellite, cable, wireless, fiber optics, audio and video media and global computer networks; transmission of television broadcasting services via communication satellites; distribution of television programming to satellite television systems | |
|---|---|---|---|---|
| DISH NETWORK & Design | 75/053,037 | 2,155,313 | communications equipment, namely, signal frequency receivers, antennae for receiving signal frequencies, and parts therefor, communications software, namely, system operating software for residential and commercial satellite receiver systems; satellite/receivers, antennae, low noise converters, decoders and encryption equipment, all for residential and commercial satellite receiver systems; option/peripheral modules for residential and commercial satellite receivers, interactive data equipment for residential and commercial satellite receiver systems, video distribution systems, namely, for residential and commercial satellite receiver systems, for the purpose of transmitting audio and video signals from a domestic communication satellite to residential and commercial satellite receiver systems and/or television systems, telephone extension circuitry, micro-processor based plastic cards which interface with/comprise the residential and commercial satellite receiver security system, software reflecting the on-screen listing of available programming, remote controls, parts and fitting for the aforementioned goods, operator maintenance, and instructional manuals distributed therewith |  |
| DISH | 78/588,871 | 3,440,594 | communications equipment; namely, signal frequency receivers, not in the nature of antennas; communications software, namely, | N/A (standard character mark) |

| | | | system application and operating software for residential and commercial satellite receiver systems; communications software, namely, networking software for residential and commercial audio, video and telephony systems; satellite receivers not in the nature of antennas, routers, hubs, cabling, and plugs, all for residential and commercial satellite receiver systems; televisions; low noise converters, feed horns, amplifiers, actuators, modulators, coaxial/custom cables, decoders and encryption equipment all for residential and commercial satellite receiver systems; optional/peripheral modules for residential and commercial satellite receivers, personal computer receiver cards; telephone extension circuitry; micro-processor based plastic cards which interface with/comprise the residential and commercial satellite receiver security system, software reflecting the on-screen listing of available programming, universal remote controls for home electronic devises, namely, televisions, VCRs, DVD players, stereo receivers, and stereo amplifiers, parts and fitting for the aforementioned goods, operator maintenance and instructional manuals distributed therewith; telecommunication services, namely, transmission of video, image, voice, audio, data information via television, satellite, cable, wireless, fiber optics, audio and video media and global computer networks; transmission of television broadcasting services via communication satellites | |
| DISH | 85/578,890 | 4,206,082 | installation services for residential and commercial satellite receivers; installation of home theatres and related structured wiring; installation of computer networking hardware | N/A (standard character mark) |
| DISH & Design | 75/125,808 | 2,075,565 | installation services for residential and commercial satellite receivers; communication services, namely, providing video, image, voice audio, and data information via communication satellite; providing television broadcasting services via |  |

| | | | communication satellite | |
|---|---|---|---|---|
| DISH LATINO | 77/766,914 | 3,816,689 | transmission of television broadcasting services via communication satellites; transmission of data, sound and images by satellite or interactive multimedia networks; satellite communication services; broadcast television transmission services; satellite television transmission services; rental of set-top boxes for use with televisions; information transmission via electronic communications networks; audio and video transmission services over the internet or other communication networks | N/A (standard character mark) |
| DISH NETWORK ON DEMAND & Design | 77/327,394 | 3,487,753 | video-on-demand and pay-per-view television transmission services; transmission of data, sound and images by satellite or interactive multimedia networks |  |
| DISH ON DEMAND | 77/328,936 | 3,552,860 | video-on-demand and pay-per-view television transmission services; transmission of data, sound and images by satellite or interactive multimedia networks | N/A (standard character mark) |
| DISH NETWORK & Design | 78/662,459 | 3,464,055 | installation services for residential and commercial satellite receivers; telecommunication services, namely, transmission of video, image, voice, audio, data information via communication satellites; transmission of television broadcasting services via communication satellites |  |
| DISH PUERTO RICO | 77/865,302 | 3,912,149 | telecommunication services, namely, transmission of video, image, voice, audio, and data information via television, satellite, cable, wireless, fiber optics, audio and video media and global computer networks; transmission of television broadcasting services via communication satellites | N/A (standard character mark) |
| DISH AMERICA | 77/777,819 | 3,971,168 | transmission of television broadcasting services via communication satellites; transmission of data, sound and images by satellite or interactive multimedia networks; satellite communication services; broadcast television transmission services; satellite television transmission services; rental of set-top boxes for use with televisions; information transmission via electronic communications networks; audio | N/A (standard character mark) |

| | | | and video transmission services over the internet or other communication networks | |
|---|---|---|---|---|
| DISH PERKS | 85/427,857 | 4,105,714 | telecommunication services, namely, transmission of video, image, voice, audio, and data information via television, satellite, cable, wireless, fiber optics, audio and video media and global computer networks; transmission of television broadcasting services via communication satellites; broadcast television transmission services; audio and video transmission services over the internet or other communication networks; rental of set-top boxes for use with televisions | N/A (standard character mark) |
| DISH2NET & Design | 77/789,756 | 3,812,086 | streaming of audio material on the Internet; streaming of audio, visual and audiovisual material via a global computer network; streaming of video material on the Internet; video streaming services via the Internet, featuring independent films and movies | dish2net |
| DISH & Design | 85/579,105 | 4,217,919 | installation services for residential and commercial satellite receivers; installation of home theatres and related structured wiring; installation of computer networking hardware | dish |

12.    By operation of law, the Dish Network registrations constitute *prima facie* evidence of the validity of the marks, and of Dish Network's exclusive right to use marks on or in connection with the claimed goods and services.  *See* 15 U.S.C. § 1115(a). Moreover, several of the aforementioned registrations have become "incontestable" pursuant to 15 U.S.C. § 1065.  An incontestable registration cannot be challenged on the basis of prior use and the evidentiary effect is "conclusive." 15 U.S.C. §1115 (b).

<u>DSC's Unauthorized Adoption and Use of an Infringing Mark – "DishNet"</u>

13.    Dish Network partners with third party retailers throughout the U.S. to market and sell Dish Network products and services under its DISH NETWORK Marks. Dish Network allows third party retailers to become "Authorized Retailers" only if they

sign a "Retailer Agreement" and a "Trademark License Agreement," which governs how the third party may and may not use the DISH NETWORK Marks.

14.     From May 1998 through December 2012, DSC operated as an Authorized Retailer pursuant to various Retailer Agreements with Dish Network.  During that time, DSC operated its business soliciting orders for Dish Network's services.  As part of its Retailer Agreements and the incorporated Trademark License Agreements, DSC was well aware of Dish Network's rights in its DISH NETWORK Marks.

15.     Nevertheless, while acting as one of Dish Network's own retailers, DSC began using a confusingly similar mark – "DishNet" – as its own trademark and trade name.  DSC also registered and began using the confusingly similar domain name "dishnet.com" for a website designed to advertise and sell Dish Network services.

16.     DSC's adoption and use of a name incorporating the DISH mark was a breach of its obligations under the agreements it signed with Dish Network.

17.     For example, the 2002 Retailer Agreement and Trademark License Agreement entered into by DSC and signed by plaintiff Kathy King (a copy of the License Agreement is attached hereto as Exhibit A) specifically prohibited DSC from using "DishNet":

> Furthermore, Licensee agrees not to hold itself out as DISH Network, ESC or any related or affiliated entity.  To avoid any confusion in this respect, Licensee agrees not to use either i) the formative 'DISH' in combination with the formative 'NET', or ii) the formative "ECHO" as part of its business name.

Exhibit A at ¶4.

18.     In addition, the agreements DSC signed with Dish Network prohibited the use of the DISH mark in any domain name.  For example, the 2002 Trademark License Agreement signed by Ms. King provides as follows:

> Furthermore, Licensee agrees not to register any domain name which contains either i) the formative 'DISH' in combination with the formative 'NET', or ii) the formative "ECHO" and Licensee further agrees to immediately transfer to ESC, upon ESC's request, any such domain names which it has registered.  Licensee's failure to comply with the provisions of this Section 4 shall constitute a material breach of this Agreement.

*Id*. at ¶4.

19.     And if a retailer does register or use a trademark or domain name containing the DISH mark, the retailer is required to assign the mark and the domain name to Dish Network.  For example, the 2002 license signed by Ms. King provides as follows:

> While Licensee has no right or authority to do so, in the event that Licensee has previously, or in the future reserves, files, or registers any of the Trademarks of ESC (whether in typewritten, stylized, or any other form) or registers any domain name which includes any of the Trademarks of ESC, Licensee agrees to notify ESC immediately, and immediately upon request of ESC, to assign any and all interest to ESC that is obtained through the reservation, filing, or registration of the Trademarks in the U.S. or any foreign jurisdiction or through the registration of any domain name, and hereby acknowledges that such reservation, filing, or registration of the Trademarks or domain name which includes any of the Trademarks, whenever occurring, shall be on behalf of and for the sole benefit of ESC, and Licensee waives all claims or rights to any compensation whatsoever therefore.

*Id*.

20.     The above contractual obligations survive to this day:

> Licensee's obligations in this paragraph shall survive the expiration or termination of this Agreement indefinitely.

*Id*.

21.     Even if there were no contracts in place between the parties, DSC's adoption and use of "DishNet" was prohibited under trademark law, which prohibits the

use of confusingly similar marks and names (and domain names) in association with the same services. "DishNet" is confusingly similar to both DISH and DISH NETWORK, and DSC uses "DishNet" in association with the identical services provided by Dish Network.

<u>DSC Demands $9,000,000 to Abide by Its Contractual and Legal Obligations</u>

22.     Dish Network launched its dishNET Internet broadband service in 2012 and realized that DSC had registered dishnet.com. Dish Network then reviewed DSC's website and learned of the extensive use of the "DishNet" mark.

23.     Dish Network immediately demanded that DSC comply with its contractual obligations and cease use of the infringing mark "DishNet" and domain name dishnet.com.

24.     DSC refused and demanded $9 million from Dish Network for the transfer of the domain name.

25.     Dish Network severed its relationship with DSC, terminating DSC as a Dish Network authorized retailer effective December 31, 2012.

26.     DSC nevertheless continued to hold itself out as an authorized Dish Network retailer (a printout of the DSC website as of March 2013 is attached hereto as Exhibit B):



27.     DSC has even taken Dish Network's proprietary stylization of its DISH

mark – the red lower case letters with the "streaming" i – and incorporated the stylized

Dish into its use of "DishNet".  See below (Attached as Exhibit C is the specimen

submitted with DSC's federal trademark application):



28.     DSC continues to impermissibly use "DishNet" to this day, as evidenced by its use of "DishNet" to describe itself in the complaint in this action.

29.     DSC also continues to advertise Dish Network products and services without authorization on its website, including Dish Network's proprietary HOPPER™ and JOEY™ DVR boxes and its DISH LATINO services.  DSC's continued advertising of Dish Network's products and services in conjunction with the "DishNet" mark and domain name is likely to confuse consumers as to the origins of DSC's products and services and whether DSC is affiliated with Dish Network.

30.     In January 2013, DSC filed a federal trademark application and a Florida state trademark application to register "DishNet" as its own trademark.  In connection

therewith, DSC signed affidavits swearing that it knew of no other party with rights in the mark:

> to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive.

> and

> to the best of my knowledge no other person except a related company has registered this mark in this state or has the right to use such mark in Florida either in the identical form thereof or in such near resemblance as to be likely, when applied to the goods and services of such other person to cause confusion, to cause mistake or to deceive.

31.     When DSC filed its trademark applications with both the USPTO and the Florida Department of State, it knew of Dish Network's rights (having even submitted the above specimens showing Dish Network's own use).  Yet, DSC intentionally made false statements to the United States Patent and Trademark Office and the Florida Department of State, respectively, in order to deceive these agencies into issuing the trademark registrations (the USPTO application is still pending).

32.     DSC then filed this lawsuit to pressure Dish Network to pay DSC millions of dollars for a domain name that DSC never had the right to register or use in the first place.

## CLAIMS FOR RELIEF
## COUNT I:  BREACH OF CONTRACT

33.     Dish Network repeats and re-alleges the allegations set forth in Paragraphs 1-32.

34.     By reason of the facts and circumstances set forth above, and specifically by DSC and King's willful refusal to cease use of "DishNet" and the domain name dishnet.com, as well their refusal to perform other obligations as set forth in the agreements between the parties, DSC and King failed to perform and materially breached these agreements.

35.     These contractual relationships required DSC and King to fulfill certain obligations, even after the expiration or termination of such agreements.

36.     Dish Network has performed its obligations under the agreements between the parties.

37.     By reason of the facts and circumstances set forth above, and specifically by DSC and King's willful refusal to cease use of "DishNet" and the domain name dishnet.com as well their refusal to perform other obligations as set forth in the agreements between the parties, DSC and King failed to perform, and materially breached these agreements.

38.     As a direct and proximate result of DSC and King's breach of contract, Dish Network has been damaged in an amount to be determined at trial.

39.     Because of DSC and King's breach, Dish Network is entitled to specific performance of DSC and King's obligations under their agreements with Dish Network.

## COUNT II:  INFRINGEMENT OF REGISTERED MARK (FEDERAL)

40.     Dish Network repeats and re-alleges the allegations set forth in Paragraphs 1-39.

41.     DSC and King's unlawful and improper actions, as set forth above, are likely to cause confusion, mistake, or deception as to the source, origin, affiliation, connection, association, or sponsorship of DSC's products and services and falsely mislead consumers into believing that DSC's "DishNet" products and services originate from, are affiliated or connected with, or are authorized or approved by Dish Network.

42.     DSC and King's unlawful and improper actions constitute infringement of Dish Network's registered DISH NETWORK Marks, in violation of the Lanham Act, 15 U.S.C. § 1114.

43.     DSC and King's acts of infringement have caused Dish Network to sustain monetary damage, loss, and injury, in an amount to be determined at trial.

44.     DSC and King have engaged in these activities willfully, so as to justify the assessment of treble damages and attorneys' fees under 15 U.S.C. § 1117.

45.     DSC and King's acts of infringement, unless enjoined by this Court, will continue to cause Dish Network to sustain irreparable damage, loss, and injury, for which Dish Network has no adequate remedy at law.

## COUNT III:  TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, AND UNFAIR COMPETITION (FEDERAL)

46.     Dish Network repeats and re-alleges the allegations set forth in Paragraphs 1-45.

47.     DSC and King's unlawful and improper actions, as set forth above, are likely to cause confusion, mistake, or deception as to the source, origin, or sponsorship of DSC's products and services, and to falsely mislead consumers into believing that DSC's

"DishNet" products and services originate from, are affiliated or connected with, or are authorized or approved by Dish Network.

48.      DSC and King's unlawful and improper actions constitute infringement of Dish Network's DISH NETWORK Marks, false designation of origin, and unfair competition, in violation of the Lanham Act, 15 U.S.C. § 1125(a).

49.      DSC and King's acts of infringement have caused Dish Network to sustain monetary damage, loss, and injury, in an amount to be determined at trial.

50.      DSC and King have engaged in these activities willfully, so as to justify the assessment of treble damages and attorneys' fees under 15 U.S.C. § 1117.

51.      DSC and King's acts of infringement, unless enjoined by this Court, will continue to cause Dish Network to sustain irreparable damage, loss, and injury, for which Dish Network has no adequate remedy at law.

## COUNT IV:  FALSE ADVERTISING (FEDERAL)

52.     Dish Network repeats and re-alleges the allegations set forth in Paragraphs 1-52.

53.     DSC and King have made representations in their advertising, including on the dishnet.com website, about the nature and quality and origin of DSC's products and services that are literally false.

54.     The foregoing misrepresentations are likely to mislead and deceive consumers into believing, incorrectly, that, for example, for the year 2013, Dish Network has granted permission and authorization for DSC to market and solicit orders for Dish Network's products and services, and that all of the products and services advertised, offered for sale, and sold by DSC on DSC's website are Dish Network's products and services and/or are sponsored or endorsed or approved by Dish Network.

55.     Based upon the foregoing, and the resulting mistaken belief that Dish Network has granted permission and authorization for DSC to provide Dish Network's DISH, DISH NETWORK, and DISHNET products and services, consumers are likely to be induced into purchasing the products and services that are being offered for sale on DSC's website.

56.     DSC and King's unlawful and improper actions constitute false and misleading advertising, in violation of the Lanham Act, 15 U.S.C. § 1125(a).

57.     The foregoing misrepresentations have caused damage to Dish Network in that consumers have purchased products and services through DSC, due to the consumers' mistaken belief that Dish Network granted permission and authorization for DSC to market and solicit orders for Dish Network's products and services, and that all of the products and services advertised, offered for sale, and sold by DSC on DSC's website are Dish Network's products and services and/or are sponsored or endorsed or

approved by Dish Network, and such purchases will continue to result in monetary damage, loss, and injury to Dish Network in an amount to be determined at trial.

58. DSC and King have engaged in these activities willfully, so as to justify the assessment of treble damages and attorneys' fees under 15 U.S.C. § 1117.

59. DSC and King's acts of infringement, unless enjoined by this Court, will continue to cause Dish Network to sustain irreparable damage, loss, and injury, for which Dish Network has no adequate remedy at law.

## COUNT V:  TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION (COMMON LAW)

60. Dish Network repeats and reiterates Paragraphs 1-59 as if set forth fully herein.

61. DSC and King's unlawful and improper actions, as set forth above, are likely to cause confusion, mistake, or deception as to the source, origin, or sponsorship of DSC's products and services, and to falsely mislead consumers into believing that DSC's "DISHNET" products and services originate from, are affiliated or connected with, or are authorized or approved by Dish Network.

62. DSC and King's unlawful and improper actions constitute infringement of Dish Network's DISH NETWORK Marks and unfair competition, in violation of Colorado and/or Florida common law.

63. DSC and King's acts of infringement have caused Dish Network to sustain monetary damage, loss, and injury, in an amount to be determined at trial.

64. DSC and King have engaged in these activities willfully.

65. DSC and King's acts of infringement, unless enjoined by this Court, will continue to cause Dish Network to sustain irreparable damage, loss, and injury, for which Dish Network has no adequate remedy at law.

## COUNT VI:  DECEPTIVE TRADE PRACTICES UNDER THE
## COLORADO CONSUMER PROTECTION ACT, C.R.S. § 6-1-101 *ET SEQ.*

66.     Dish Network repeats and re-alleges the allegations set forth in Paragraphs 1-65.

67.     DSC and King's unlawful and improper actions, as set forth above, are likely to cause confusion, mistake, or deception as to the source, origin, or sponsorship of DSC's products and services, and to falsely mislead consumers into believing that DSC's "DISHNET" products and services originate from, are affiliated or connected with, or are authorized or approved by Dish Network.

68.     The agreements between parties states that Colorado law applies to any disputes between the parties.

69.     In the course of their business, DSC and King have passed off their goods, services, as those of Dish Network and/or the DISH NETWORK Marks.

70.     In the course of their business, DSC and King are knowingly making false representations in their advertising, including but not limited to, on their website, as to the nature or quality and origin of their goods and services.

71.     DSC and King's false representations on their website and in their advertising were and are directed to the market generally, taking the form of widespread, nationwide advertisement, which does not exclude Colorado residents (and in fact was specifically directed to Colorado residents).  DSC's goods and services are closely related and directly compete with Dish Network's goods and services offered under the DISH NETWORK Marks, and are offered and provided through the same markets and channels of trade to the same relevant consumers, including customers in this Judicial District. DSC and King's actions have and do create a significant public impact on actual or potential consumers of Dish Network's goods and services.

72.     Based on the foregoing, DSC and King have engaged in deceptive trade practices as defined, *inter alia,* by the Colorado Consumer Protection Act, C.R.S. §§ 6-1-105(1)(a),(b),(c) or (e).

73.     DSC and King's acts in violation of the Colorado Consumer Protection Act have caused Dish Network to sustain monetary damage, loss, and injury, in an amount to be determined at trial.

74.     DSC and King have engaged in these activities willfully.

75.     DSC and King's acts of infringement, unless enjoined by this Court, will continue to cause Dish Network to sustain irreparable damage, loss, and injury, for which Dish Network has no adequate remedy at law.

## COUNT VII: VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

76.     Dish Network repeats and realleges the allegations set forth in Paragraphs 1-75.

77.     DSC and King's unlawful and improper actions, as set forth above, are likely to cause confusion, mistake, or deception as to the source, origin, or sponsorship of Dish Network's products and services, and to falsely mislead consumers into believing that DSC's "DISHNET" products and services originate from, are affiliated or connected with, or are authorized or approved by Dish Network.

78.     DSC and King's unlawful and improper actions constitute violation of Fla. Stat. § 501.201 et seq.

79.     DSC and King's acts in violation of the Florida Deceptive and Unfair Trade Practices Act have caused Dish Network to sustain monetary damage, loss, and injury, in an amount to be determined at trial.

80.     DSC and King have engaged in these activities willfully.

81.     DSC and King's acts of infringement, unless enjoined by this Court, will continue to cause Dish Network to sustain irreparable damage, loss, and injury, for which Dish Network has no adequate remedy at law.

## COUNT VIII:  CYBERSQUATTING (FEDERAL)

82.     Dish Network repeats and re-alleges the allegations set forth in Paragraphs 1-81.

83.     The domain name, dishnet.com, is confusingly similar to Dish Network's DISH NETWORK Mark, which was distinctive and well-known at the time that the dishnet.com domain name was registered.

84.     In registering, trafficking, and using the Domain Name, DSC and King intended to attract consumers interested in Dish Network's products and services to DSC's website in order to solicit orders and sales for the television programming and mobile phone and/or Internet services that DSC and King were selling.

85.     DSC and King have registered, trafficked, and used dishnet.com for DSC and King's commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation, authorization, and/or endorsement of the products and services being sold on DSC's website, and with a bad faith intent to profit from Dish Network's DISH NETWORK Marks.

86.     When Dish Network requested that DSC and King transfer their domain name pursuant to Dish Network's contractual rights, DSC and King offered to sell the domain name (in contravention of their contractual obligations) to Dish Network for $9 million.  DSC and King clearly intended to profit from the sale of the domain name to Dish Network knowing they lacked any bona fide right to use the domain name.

87.     DSC and King's unlawful activities constitute cybersquatting in violation of the Lanham Act, 15 U.S.C. § 1125(d).

88.     DSC and King's acts of cybersquatting are likely to cause damage to Dish Network in that consumers are induced into purchasing the television programming and mobile phone and/or Internet services that DSC and King are selling on DSC's website, due to this mistaken belief; and such purchases have resulted, and will continue to result, in lost revenues to Dish Network, in an amount to be determined at trial.

89.     DSC and King have engaged, and continue to engage, in this activity knowingly and willfully, so as to justify the assessment of increased and punitive damages against them, in an amount to be determined at trial.

90.     DSC and King's acts of cybersquatting, unless enjoined by this Court, will cause Dish Network to sustain irreparable damage, loss, and injury, for which Dish Network has no adequate remedy at law.

## COUNT IX: FEDERAL DILUTION

91.     This cause of action for dilution arises under the trademark laws of the United States, 15 U.S.C. § 1125(c).  Dish Network repeats and re-alleges the allegations set forth in Paragraphs 1-90.

92.     Dish Network's DISH NETWORK Marks have been extensively used, advertised, and promoted throughout the United States, and have come to be recognized as a designation of origin of Dish Network's goods and services.  The DISH NETWORK Marks have become famous to the general consuming public of the United States.

93.     The acts of DSC and King complained of herein constitute dilution of the distinctive quality of Dish Network's DISH NETWORK Marks in violation of the Trademark Dilution Revision Act, 15 U.S.C. § 1125(c).

94.     The aforesaid acts of DSC and King have caused, and unless enjoined by this Court, will continue to cause, irreparable damage, loss, and injury to Dish Network for which Dish Network has no adequate remedy at law.

## COUNT X:  FRAUD UPON FLORIDA DEPARTMENT OF STATE

95.     Dish Network repeats and re-alleges the allegations set forth in Paragraphs 1-94.

96.     DSC and King knowingly made at least one false, material representation with the intent to deceive the Florida Secretary of State.

97.     DSC and King knew at the time of making this statement, and throughout the time the application was pending, that it was false.

98.     Upon information and belief, DSC and King made this false, material statement with the intent to deceive the Florida Department of State.

99.     In reliance upon this false and material representation to the Florida Department of State, Registration No. L12000162008 issued in the State of Florida for the mark DISHNET for communications services, internet access services and sales of television communications programming, in DSC's name.

100.    This registration was obtained fraudulently and subject to cancellation pursuant to Florida Statute Title XXXIII Chapter 495.101.

101.    The registration of the mark DISHNET to DSC for services identical to what Dish Network offers under its DISHNET mark will cause Dish Network to sustain irreparable damage, loss and injury, for which Dish Network has no adequate remedy at law.

WHEREFORE, Dish Network prays for relief as follows:

A.      That all of the claims in the Complaint against Dish Network be dismissed with prejudice;

B.      For a preliminary and permanent injunction against DSC and King, and each of their affiliates, officers, agents, servants, and employees:

1.      Restraining and enjoining DSC and King from using the DISH NETWORK Marks, or any similar mark, or any reproduction, counterfeit, copy, colorable imitation or confusingly similar variation of the DISH NETWORK Marks (including but not limited to DISHNET) (a) as a trade name, trade mark, service mark, brand name, domain name, or business or commercial designation; (b) in operating, maintaining, or using a web site or domain name that incorporates the DISH NETWORK Marks, or any formative component thereof (including but not limited to the formative components "DISH," "NETWORK," and "NET"), on the Internet, or in connection with other Internet uses; or (c) in any other manner suggesting in any way that DSC or King and/or their activities, products, or services originate from, are affiliated with, or are sponsored, authorized, approved, or endorsed by Dish Network, or that Dish Network and/or its activities, products, or services are affiliated in any way with DSC or King;

2.      Restraining and enjoining DSC and King from using any other mark, term, slogan, tag line, or phrase which suggests or tends to suggest in any way that DSC or King and/or their activities, products, or services originate from, are affiliated with, or are sponsored, authorized, licensed, approved or endorsed by Dish Network, or that Dish Network or its activities, products, or services are affiliated in any way with DSC or King.

38

C.      Requiring that DSC and King account to Dish Network for any and all profits derived by DSC and King from the sale of their services and any related goods, and for all damages sustained by Dish Network by reason of said unlawful and improper actions, as set forth herein;

D.      That this Court, pursuant to the powers granted it under 15 U.S.C. § 1117 and/or C.R.S. § 6-1-113(2)(a)(III), increase any award to Dish Network by three (3) times;

E.      That this Court, pursuant to the powers granted it under 15 U.S.C. § 1117(d)  transfer the domain name, dishnet.com, to DISH Network L.L.C.

F.      That should Dish Network elect to pursue statutory damages in lieu of actual damages, this Court pursuant to the powers granted it under 15 U.S.C. § 1117(d) award Dish Network statutory damages in the amount of $100,000;

G.      That this Court, order DSC and King to specifically perform their obligations under the agreements between the parties, including ceasing use of trademarks and trade names, and transferring domain names to Dish Network that incorporate formatives of the Dish Network Marks, including dishnet.com.

H.      That this Court, pursuant to the powers granted it under 15 U.S.C. § 1118 and under common law, and by the terms of the agreements between the parties, order that all of DSC and King's advertising materials bearing any mark consisting of or including the DISH NETWORK Marks be delivered to Dish Network or be destroyed;

I.     That this Court award punitive and exemplary damages against DSC and King and in favor of Dish Network by reason of DSC and King's willful, intentional, and/or reckless disregard for Dish Network's rights;

J.     That this Court, pursuant to the powers granted it under 15 U.S.C. § 1117 and/or C.R.S. § 6-1-113(2)(b), award the costs of this action to Dish Network;

K.     That this Court, pursuant to the powers granted it under 15 U.S.C. § 1117 and/or C.R.S. § 6-1-113(2)(b), and/or Fla. Stat. § 501.2105 and/or the agreements between the parties, award reasonable attorneys' fees to Dish Network;

L.     That this Court, pursuant to the powers granted it under 15 U.S.C. § 1117, award pre and post judgment interest where appropriate to Dish Network;

M.     That this Court, pursuant to the powers granted it under 15 U.S.C. § 1116 and common law, order that any federal trademark application filed by DSC or King for the mark DISHNET for communications services, internet services and/or television programming, or products or services related thereto, be expressly abandoned by DSC and King.

N.     That this Court direct the Florida Department of State to cancel Registration No. L12000162008 on grounds of fraud pursuant to Florida Statute Title XXXIII Chapter 495.101(3)(d); and

O.     That this Court grant such other and further relief as it deems just and reasonable.

## DEMAND FOR JURY TRIAL

Defendants DISH Network Corporation, DISH Network L.L.C., and dishNET

Satellite Broadband L.L.C. demands trial by jury on all issues so triable as to all counts of

Plaintiffs' Complaint and Defendants' Counterclaims.

## CERTIFICATE OF SERVICE

I hereby certify that a copy hereof was served by mail this 15th day of April, 2013

upon:

**Paul B. Overhauser**
Overhauser Law Offices, LLC
740 W. Green Meadows Dr., Ste. 300
Greenfield, IN 46140
317 891-1500
Email: poverhauser@overhauser.com

**Weldon Mark Burnette**
Mark Burnette, PA
1701 NE 42nd Ave - Ste 401
PO Box 2913
Ocala, FL 34478
352/216-1889
Email: burnette_mark@yahoo.com

Dated:  April 15, 2013

/s/ Robert B. Buchanan

Robert B. Buchanan
Florida Bar No.: 0063400
SIBONI, BUCHANAN & MCLEAN, PLLC
1900 S.E. 18th Avenue, Suite 300
Ocala, FL 34471
Tel. (352) 629-7441
Fax. (352) 629-7745
rbuchanan@sbtrial-law.com

James E. Rosini (admitted *pro hac vice*)
Margaret C. Lu (admitted *pro hac vice*)
KENYON & KENYON
One Broadway
New York, New York 10004
Tel. (212) 425-7200
Fax. (212) 425-5288

Susan A. Smith (admitted *pro hac vice*)
Erik C. Kane (*pro hac vice* pending)
KENYON & KENYON
1500 K Street, N.W.
Washington, D.C.  20005
(202) 220-4200
(202) 220-4201 (facsimile)

Attorneys for Defendants,
*Dish Network Corporation, Dish Network
LLC, and Dishnet Satellite Broadband, LLC*

# EXHIBIT A

## ATTACHMENT A

### TRADEMARK LICENSE AGREEMENT

THIS TRADEMARK LICENSE AGREEMENT (the "Agreement") is made by and between EchoStar Satellite Corporation, with a place of business at 5701 South Santa Fe Drive, Littleton, Colorado 80120 ("ESC") and _Digital Satellite Connections_ , having a principal place of business at _3620 S.W 1890Ve Dunnellon, FL 34422_ ("Licensee").

A.        ESC conducts business in worldwide locations as, among other things, a provider of direct broadcast satellite-delivered, multi-channel, digital audio and video services ("Programming");

B.        Licensee conducts business as, among other things, a retailer of satellite television products and services; and

C.        Licensee desires to be permitted to use the EchoStar trademarks, service marks and trade names set forth in Exhibit 1 hereto, which may be amended at any time and for any reason in ESC's sole discretion (the "Trademarks") as ESC, in its sole discretion and for any reason, may authorize, from time to time, under a non-exclusive license, to promote and solicit orders for DISH Network Programming.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1.        ESC hereby grants to Licensee a non-exclusive, non-transferable, revocable license (the "License") to use the Trademarks and such other trademarks as ESC may from time to time expressly in writing permit Licensee to use during the term of this Agreement, and no other term or license whatsoever, solely to promote the retail sale of ESC satellite television programming and the hardware necessary to receive such programming in its local advertising and promotional materials and at its business locations. Licensee shall have no right to use the logos, service marks or trademarks (whether in typewritten, stylized or any other form) of any programming providers, other than the logos, service marks and trademarks of programming providers that are contained in the advertising and promotional material provided to Licensee by ESC. No such materials shall indicate that any agreement of agency, partnership, joint venture, franchise or exclusive or non-exclusive distributorship exists between Licensee and ESC, unless ESC and Licensee enter into a separate written agreement permitting Licensee to do so. Notwithstanding the above, Licensee shall provide to ESC, at least thirty (30) days prior to first use, an example of any advertising or promotional materials in which Licensee intends to use any Trademarks or any such other trademarks (whether in typewritten, stylized or any other form), which use has not, within the past twelve months, been approved by ESC in exactly the manner intended for use. ESC may reject and prohibit Licensee from using such materials, for any reason or reasons in its sole discretion. If Licensee is required to, but fails to provide ESC with proposed advertising or promotional materials at least thirty (30) days prior to first use, ESC shall have just cause to immediately terminate the License by providing written notice to Licensee to that effect. This Agreement is not intended, nor shall it be construed, as creating any agreement of agency, partnership, joint venture, franchise or of exclusive or non-exclusive distributor, or as creating any obligation on the part of ESC to enter into any such agreement with Licensee. Further, this Agreement is not intended, nor shall it be construed, as providing any rights to Licensee to purchase or sell products or programming manufactured and/or distributed by ESC. Licensee expressly recognizes and agrees that any goodwill now existing or hereafter created through any sales by Licensee of products or programming manufactured and/or distributed by ESC, shall inure to ESC's sole benefit. This License shall be effective until terminated by either party in accordance with the terms of this Agreement, or until termination of the Retailer Agreement between ESC and Licensee.

2.        The License granted by ESC is granted to Licensee only. Licensee has no authority to transfer or grant any sublicense to any other entity or individual for any reason, and if Licensee does so, such action shall terminate the License granted herein, at ESC's option, at any time thereafter. Licensee shall immediately cease using Trademarks in typewritten, stylized or any other form upon termination or expiration of this Agreement for any reason. Upon expiration or termination of this Agreement, at ESC's option Licensee shall immediately destroy or deliver to ESC any and all advertising and promotional materials in Licensee's possession with Trademarks (whether in typewritten, stylized or any other form) on them. If ESC requests destruction of advertising and promotional materials, Licensee shall promptly execute an affidavit representing at a minimum that such materials were destroyed, and the date and means of destruction.

3.        Licensee expressly recognizes and acknowledges that this License, as well as any past use of the Trademarks in any manner whatsoever by Licensee (including but not limited to use on signs, business cards, or in advertisements) or in any form whatsoever by Licensee (including but not limited to typewritten or stylized form), shall not confer upon Licensee any proprietary rights or interest to any Trademarks including, but not limited to any existing or future goodwill in the Trademarks. All goodwill in the Trademarks shall inure to ESC's sole benefit. Further, Licensee waives any and all past, present, or future claims it has or might have to the Trademarks (whether in typewritten, stylized or any other form) and acknowledges that as between ESC and Licensee, ESC has the exclusive rights to own and use the Trademarks (whether in typewritten, stylized or any other form), and that ESC retains full ownership of the Trademarks (whether in typewritten, stylized or any other form) notwithstanding the License granted herein. While Licensee has no right or authority to do so, in the event that Licensee has previously, or in the future reserves, files, or registers any of the Trademarks of ESC (whether in typewritten, stylized or any other form) or registers any domain name which includes any of the Trademarks of ESC, Licensee agrees to notify ESC immediately, and immediately upon request of ESC, to assign any and all interest to ESC that is obtained through the reservation, filing, or registration of the Trademarks in the U.S. or any foreign jurisdiction or through the registration of any domain name, and hereby acknowledges that any such reservation, filing, or registration of the Trademarks or domain name which includes any of the Trademarks, whenever occurring, shall be on behalf of and for the sole benefit of ESC, and Licensee waives all claims or rights to any compensation whatsoever therefore. Licensee's obligations in this paragraph shall survive the expiration or termination of this Agreement indefinitely.

4.        Furthermore, Licensee agrees not to hold itself out as DISH Network, ESC or any related or affiliated entity. To avoid any confusion in this respect, Licensee agrees not to use either i) the formative "DISH" in combination with the formative "NET", or ii) the formative "ECHO" as part of its business name. Furthermore, Licensee agrees not to register any domain name which contains either i) the formative "DISH" in combination with the formative "NET", or ii) the formative "ECHO" and Licensee further agrees to immediately transfer to ESC, upon ESC's request, any such domain names which it has registered. Licensee's failure to comply with the provisions of this Section 4 shall constitute a material breach of this Agreement.

I:\cmm\Retailer Agreements\retailer version 1.0.doc

5.      Nothing in this Agreement shall be construed to bar ESC from protecting its right to the exclusive use of its Trademarks (whether in typewritten, stylized or any other form) against infringement thereof by any party or parties, including Licensee, either during the term of this Agreement or following any expiration or termination of Licensee's right to use the Trademarks pursuant to this Agreement. Licensee will promptly and fully advise ESC of any use of any mark that may appear to infringe the Trademarks (whether in typewritten, stylized or any other form). Licensee will also fully cooperate with ESC in defense and protection of the Trademarks (whether in typewritten, stylized or any other form), at ESC's expense. Similarly, nothing in this Agreement shall be construed to require that ESC take any action to protect the Trademarks in any instance, and ESC shall not be liable to Licensee in any manner whatsoever for failure to take any such action.

6.      (a)      This Agreement shall continue for a period of time equal to the term of the Retailer Agreement to which this Agreement is attached, unless terminated earlier for a reason provided herein. Any provision of this Agreement which logically would be expected to survive termination or expiration, shall survive for a reasonable time period under the circumstances, whether or not specifically provided in this Agreement.

(b)      This Agreement may be terminated by a party (the "Affected Party") in the event that the other party (the "Other Party") defaults on any obligation or breaches any representation, warranty or covenant in this Agreement (regardless of whether breach or default of such obligation, representation, warranty or covenant is designated as giving rise to a termination right), and such default or breach, if curable, is not cured within thirty (30) days of receipt of written notice from the Affected Party. The parties agree that all obligations, representations, warranties and covenants contained in this Agreement, whether or not specifically designated as such, are material to the agreement of the parties to enter into and continue this Agreement.

(c)      This Agreement shall terminate automatically upon termination of the Retailer Agreement to which this Agreement is attached any Other Agreement (as defined in Section 6.8 of the Retailer Agreement) for any reason, unless EchoStar notifies Licensee to the contrary in writing.

7.      The relationship between the parties including all disputes and claims, whether arising in contract, tort, or under statute, shall be governed by and construed in accordance with the laws of the State of Colorado without giving any effect to its conflict of law provisions. Licensee and EchoStar acknowledge and agree that they and their counsel have reviewed, or have been given a reasonable opportunity to review, this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments of Exhibits hereto.

Any and all disputes arising out of, or in connection with, the interpretation, performance or the nonperformance of this Agreement or any and all disputes arising out of, or in connection with, transactions in any way related to this Agreement and/or the relationship between the parties (including but not limited to the termination of this Agreement or the relationship and Licensee's rights there under or disputes under rights granted pursuant to statutes or common law, including those in the state in which Licensee is located) shall be litigated solely and exclusively before the United States District Court for the District of Colorado. The parties consent to the *in personam* jurisdiction of said court for the purposes of any such litigation, and waive, fully and completely, any right to dismiss and/or transfer any action pursuant to 28 U.S.C.S. 1404 or 1406 (or any successor statute). In the event the United States District Court for the District of Colorado does not have subject matter jurisdiction of said matter, then such matter shall be litigated solely and exclusively before the appropriate state court of competent jurisdiction located in Arapahoe County, State of Colorado.

8.      This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized representatives as of the day and year first above written.

ECHOSTAR SATELLITE CORPORATION

By: _____

Title: VP OF SALES

DEC 31 2002

Date: _____

LICENSEE

By: Cathra L. King

Title: owner

Date: 12/4/02

This agreement is subject to the letter
dated March 15th, 2003  regarding
"Important Information About Your Retailer Agreement"

EXHIBIT 1 TO TRADEMARK LICENSE AGREEMENT







# EXHIBIT B

Why DISH Business



# EXHIBIT C













